UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

JAMES CORGAN,

                Plaintiff,

v.

MIKE KEEMA, *et al.*,

                Defendants.

Case No. 3:14-cv-00692-RCJ-WGC

**REPORT & RECOMMENDATION OF U.S. MAGISTRATE JUDGE**

This Report and Recommendation is made to the Honorable Robert C. Jones, Senior United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

Before the court is Defendant Mike Keema and Elko County's Motion for Summary Judgment. (ECF No. 83; Exhibits at ECF Nos. 83-1 to 83-6.) Plaintiff filed a response (ECF No. 93; Exhibits at ECF Nos. 93-1 to 93-8) and a supplemental response (ECF Nos. 96, 96-1). Defendants filed a reply. (ECF No. 99.)

After a thorough review, the court recommends that Defendants' motion be granted as to the single federal claim, and that the court decline to retain jurisdiction with respect to the remaining state law claims, which should be dismissed without prejudice.

**I. BACKGROUND**

Plaintiff, who is represented by counsel, filed his original complaint on December 31, 2014. (Compl., ECF No. 1; Exhibits to Compl., ECF No. 2.) After the court issued rulings on a motion to dismiss (*see* ECF Nos. 42, 45), Plaintiff filed an amended complaint (ECF No. 62), which is now the operative pleading. The events giving rise to this action took place while Plaintiff was in custody at the Elko County Jail.

The amended complaint named as defendants Mike Keema, Brad Warwick and Elko County (ECF No. 62 at 1), but Warwick was subsequently dismissed pursuant to stipulation (ECF Nos. 82, 85); therefore, the remaining defendants are Keema and Elko County.

The amended complaint alleges that Keema (who is alleged to have been employed by the Elko County Sheriff's Office) (and Warwick) obtained a search warrant and agents executed it at the residence of Villano and left documentation that identified Plaintiff as a confidential informant whose information led to the issuance of the warrant (and subsequent arrest of Cortez). (ECF No. 62 at 1-2 ¶¶ 2-3.) After the execution of the warrant, Cortez discovered Plaintiff's involvement from Villano, and Plaintiff was arrested and placed into the same cell as Cortez. (*Id.* at 2 ¶ 4.) On August 12, 2012, Cortez allegedly beat Plaintiff. (*Id.*) Plaintiff alleges that Elko County and Keema knew Plaintiff was the confidential informant with respect to Cortez's arrest and incarceration and were deliberately indifferent to Plaintiff's health and safety in light of this knowledge. (*Id.* at 2 ¶ 5.)[1]

Plaintiff contends that in enlisting Plaintiff as a confidential informant in the investigation leading to the arrest of Cortez, Keema entered into an agreement that Plaintiff's identity would remain confidential in return for his cooperation in providing information leading to Cortez's arrest. (ECF No. 62 at 2 ¶ 6.) He avers that this created a duty on the part of Keema and Elko County to ensure that Plaintiff's identity would be maintained as confidential, and this included a duty not to house Plaintiff in the same cell as Cortez. (*Id.*) He contends that Keema was involved in the execution of the search warrant and knew Plaintiff's identity had been disclosed with the search warrant material left at the Villano residence, which put him on notice that the identity would be disclosed not only to Villano but to Cortez. (*Id.* ¶ 7.)[2]

---

[1] The claims asserted against Defendants relative to Plaintiff's beating by Cortez were dismissed with prejudice as barred by the statute of limitations. The claims for relief in the amended complaint do not center around the Cortez allegations; therefore, the court construes these allegations as being included as background information in the amended complaint.

[2] Again, the claims relative to the placement of Plaintiff in a cell with Cortez have been dismissed as barred by the statute of limitations.

Plaintiff claims that Bryan Paige was another cohort of Cortez, and after Cortez beat Plaintiff at the jail and Plaintiff was released, Cortez contracted with Paige to have Plaintiff shot, and Paige did shoot Plaintiff on January 2, 2013. (*Id*. ¶ 8.) Paige was eventually arrested and convicted for the shooting. (*Id*. ¶ 9.) Upon Plaintiff's subsequent arrest, Plaintiff claims Defendants placed him in the same cell block as Paige, causing Plaintiff to fear for his life and safety. (*Id*.) He avers that Defendants knew of the connection between Villano, Cortez, and Paige; that Plaintiff had been assaulted by Cortez; and that Paige shot Plaintiff; and as such, that Paige posed a danger to Plaintiff. (*Id*. at 3 ¶ 10.) He contends that this created a duty "based upon their knowledge and agreement with Plaintiff" to refrain from placing Plaintiff in a position of danger vis-à-vis Paige." (*Id*.)

Plaintiff asserts four claims for relief based on these facts. The first claim appears to be a state law claim for intentional infliction of emotional distress (IIED) and alleges that Keema and Elko County intentionally caused Plaintiff to be placed in fear of his life and safety when they housed him in the same cell block as Paige, and this caused Plaintiff to suffer severe emotional distress manifested by insomnia, nausea, shaking, and sweating. (ECF No. 62 at 3 ¶¶ 13-16.)

The second claim is a state law claim of negligence, alleging that Keema and Elko County failed to exercise reasonable care for the safety of Plaintiff in placing him in the same cell block as Paige and in failing to intercede to prevent that from occurring when they had an opportunity to do so. (ECF No. 62 at 4 ¶ 18.) He also alleges that Keema and Elko County failed to exercise reasonable care with respect to maintaining Plaintiff's confidentiality as an informant as that information was allowed to fall into hands that led to Plaintiff's shooting by Paige. (ECF No. 62 at 4 ¶ 19.)

The third claim for relief is a state law breach of contract claim. Plaintiff alleges that Keema and Elko County breached the confidential informant agreement entered into with Plaintiff, which included an agreement to keep Plaintiff's identity confidential, when they allowed materials identifying him as the confidential informant to be exposed during execution of the search warrant. (ECF No. 62 at 4 ¶¶ 22-23.)

Finally, in the fourth claim for relief, brought pursuant to 42 U.S.C. § 1983, Plaintiff alleges that Keema violated Plaintiff's right to be free from serious risk of harm from other inmates and that Defendants acted with subjective knowledge that Paige posed a serious risk of harm to Plaintiff and disregarded that risk. (ECF No. 62 at 5 ¶¶ 29-30.) Plaintiff goes on to allege that this type of conduct is a custom of Elko County, evidenced by the multiple exposures of Plaintiff and others to similar harmful situations in housing inmates, subjecting Elko County to municipal liability. (*Id.* ¶ 31.)

Defendants now move for summary judgment.

## II. LEGAL STANDARD

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). In considering a motion for summary judgment, all reasonable inferences are drawn in favor of the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1)(A), (B).

If a party relies on an affidavit or declaration to support or oppose a motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that

the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

In evaluating whether or not summary judgment is appropriate, three steps are necessary: (1) determining whether a fact is material; (2) determining whether there is a genuine dispute as to a material fact; and (3) considering the evidence in light of the appropriate standard of proof. *See Anderson*, 477 U.S. at 248-250. As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment; factual disputes which are irrelevant or unnecessary will not be considered. *Id*. at 248.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'...In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a genuine dispute of material fact, the opposing party need not establish a genuine dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to

find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. Id. Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

> That being said,
>
> [i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).

At summary judgment, the court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine dispute of material fact for trial. *See Anderson*, 477 U.S. at 249. While the evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in its favor," if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *Id*. at 249-50 (citations omitted).

### III. DISCUSSION

**A. Background Facts**

The following facts are undisputed unless otherwise noted:

In 2012, Plaintiff was arrested in Elko and was facing charges, including trafficking methamphetamine. (ECF No. 83 at 4; ECF No. 83-1 at 33, Pl.'s Depo. Trans. p. 51.) While in jail, he decided that he wanted to see if he could get a break if he cooperated with law enforcement, and he had his girlfriend call the NDI office and ask them to come interview him. (ECF No. 83 at 4; ECF No. 83-1, Pl.'s Depo. Trans. pp. 51-52.) On July 5, 2012, he was summoned from his cell to a meeting with his attorney (John Stephenson, Esq.), Keema and

Warwick, and was interviewed. (ECF No. 83 at 4; ECF No. 83-1, Pl.'s Depo. Trans. pp. 61; ECF No. 83-4, Pl.'s Interview Trans.) Keema was a detective with the Elko County Sheriff's Department, assigned to the Elko Combined Narcotics Unit. (ECF No. 83-5 at 2; Keema Aff. in Support of App. for Search Warrant.)

The transcript reflects that Stephenson noted in the record that he and District Attorney Chad Thompson entered into an agreement whereby anything said by Plaintiff during the interview could not be used against him in his three pending cases (involving drug trafficking, ex-felon in possession of firearms, and possession of methamphetamine) or to initiate future criminal prosecutions. (ECF No. 83-4 at 3-4.)

Keema then proceeded to ask Plaintiff about where he was getting his methamphetamine from and about the persons he was involved in the drug trade within Elko and Elko County. (*Id*. at 5-6.) Before they got into the details, Keema relayed that Plaintiff's background would weigh into whether they could even use Plaintiff. (ECF No. 83-4 at 15.) Plaintiff immediately offered up that he had prior domestic violence and assault with a deadly weapon charges in Washington, but represented they were old charges. (*Id*. at 15-16.) Keema told him those were the types of things that would have to be looked into. (*Id*. at 16-17.) Keema again advised Plaintiff they had not yet run his background check, which may result in them not being able to use Plaintiff. (*Id*. at 18.)

The parties then entered into a lengthy exchange precipitated by Plaintiff asking whether anyone would find out "this was happening," referring to his cooperation with law enforcement. (ECF No. 83-4 at 21, Interview Trans. at p. 20:7-11.) Keema discussed that obviously if there was a trial, Plaintiff would have to testify and the people he was testifying against would then know his involvement. (ECF No. 83-4 at 21-22, Interview Trans. at p. 20:14-25, p. 21:1-10.) Plaintiff voiced some concern apparently over a situation involving another person who was cooperating with law enforcement in the past (ECF No. 83-4 at 22, Interview Trans. at p. 21:11-17), and Keema reassured Plaintiff: "I'm not going to discuss that. But I'll tell you this. Nobody ever hears anything out of our office." (ECF No. 83-4 at 22, Interview Trans. at p. 21:21-23.) Plaintiff specifically asked if his "Mexicans" were going to be able to find out, and Keema said

no, "no one" would find out from his office. (ECF No. 83-4 at 23, Interview Trans. at p. 22:1-3.) Keema reiterated: "No one ever goes through our office and gets information. I can absolutely, 100 percent, deep in my heart know that nothing ever--leaks out of our office." (ECF No. 83-4 at 23, Interview Trans. at p. 22:5-9.) He warned Plaintiff about telling anyone on his end what was going on. (ECF No. 83-4 at 23-24, Interview Trans. at p. 22:20-21, p. 23:5-10.) He said again, "I mean people who generally find out, they don't' find out from us, man." (ECF No. 83-4 at 25, Interview Trans. at p. 24:9-11.) Keema advised Plaintiff there was no witness protection program. (ECF No. 83-4 at 25-26, Interview Trans. at p. 24:21-23. p. 25:1-11.) The interview then turned to the substantive details concerning the drug trafficking.

Toward the end of the interview, Detective Keema reiterated that they had to look into Plaintiff's background and "get approval from like Carson City for them to say, yea, we're down with this." (ECF No. 83-4 at 104.) Keema stated: "And then, like I said, maybe it'll work, maybe it won't, man, you know. No hard feelings if it doesn't." (ECF No. 83-4 at 107.) Plaintiff said he understood that people above Keema's pay grade would have to sign off. (*Id*. at 107-08.)

It turned out that Plaintiff had a warrant out of Washington, and he did not qualify until that was taken care of. (Pl. Depo., ECF No. 83-1 at 36.) According to Defendants, no confidential informant agreement was ever entered into. (ECF No. 83 at 5.)

During the interview, Plaintiff told Keema that he purchased the methamphetamine he had been selling from a person named "Jose" at 960 Panorama Drive in Elko, Nevada. (ECF No. 83-5 at 6 ¶ 13.) According to Keema, on August 9, 2012, he and Sergeant Stuehling drove by the home at 960 Panorama Drive. (ECF No. 83-5 at 6 ¶ 15, Keema Aff. in Support of App. for Search Warrant.) Keema noticed two trash bins in front of the residence, and he and Stuehling retrieved one of them and took it to the Sheriff's Office to be searched. (Id. ¶ 16.) The search revealed numerous plastic bags with what appeared to be marijuana residue, saran wrap with an oily substance and strong, sweet smelling odor. (*Id*. at 7 ¶ 17.)

Keema filled out the search warrant application on August 10, 2012 and the attached affidavit. (ECF No. 83-3 at 8, Keema Depo.; ECF No. 83-5.) The affidavit identified Plaintiff as the source of information which led the officers to believe drugs were being sold from the

Panorama Drive address. (ECF No. 83-5 at 6.) The warrant issued and was signed by the justice of the peace on the same date. (*Id*. at 9.)

The search warrant was executed on August 10, 2012. If property is take during execution of a search warrant, a copy of the warrant and receipt for the property must be left at the place where the search was executed. Nev. Rev. Stat. 179.075(2). A copy of the search warrant and affidavit were left at the Panorama residence. (ECF No. 83 at 6:14-15.)

Five months later, on January 2, 2013, Plaintiff was shot by Bryan Paige. (ECF No. 83-1 at 39-45, Pl.'s Depo.)

Plaintiff testified at Paige's criminal trial that he was shot because Plaintiff sold property that belonged to both him and Paige, without telling Paige. (ECF No. 83-1 at 38.) While he did not testify to it in court, he now claims that another reason Paige shot him was because Paige was paid to do so. (*Id*.)

Plaintiff was arrested again in Kings Beach, California in February of 2013, and placed in the Placer County Jail in Auburn, California. (ECF No. 83 at 6; ECF No. 83-1 at 30, Pl.'s Depo.) He was subsequently extradited to Elko County Jail. (ECF No. 83 at 7; ECF No. 93-1 at 9, p. 138: 19-21.)

Bobby Adkins testified that it was June and the week of the "jamboree" and they move people around and make room in the jail during that weekend, and as a result of the need to make room, he moved Paige from the B block of cells into the E block of cells, where Plaintiff was housed. (ECF No. 83-6 at 4.) Adkins testified that Plaintiff did not object to Paige being placed in his cell to Adkins. (*Id*. at 5.) Adkins testified that when Paige was put in the cell, Paige said, "Hey, bud, what's up?" and they shook hands and hugged. (*Id*.) Adkins first got word that Plaintiff wanted to be moved when Plaintiff's attorney called, and one of them was moved as a result. (*Id*. at 5-6.)

Plaintiff acknowledged that when the (biker) Jamboree comes to Elko in June, they consolidate the jail, and Plaintiff was in E block, and Paige was placed in B block, and when they consolidated the jail, they brought fifteen men into Plaintiff's cell block, including Paige. (ECF No. 83-1 at 46, Pl.'s Depo.) Plaintiff claims that Sergeant Adkins opened the door and

said: "Oh, imagine that, Corgan and Paige in the same cell" and closed the door. (*Id*.) Plaintiff says that he told the woman in charge of the controls, "Look. You guys just put Paige in the same cell with me," and she hung up on him. (*Id.* at 47.) Plaintiff then immediately went to call his attorney, who called the district attorney. (*Id*. at 46-47.)

He testified there was no issue with Paige in the jail "because [he] thought it was a setup." (ECF No. 93-1 at 9, p. 141:9-11.) Paige never threatened Plaintiff or tried to harm him while he was in the cell with Plaintiff. (ECF No. 93-1 at 10, p. 143:20-24.) Plaintiff tried to avoid Paige. (*Id.* at 144:6-8.)

Plaintiff testified that when he was arrested in 2012 for possession, he went through intake at Elko County Jail and was asked if he had any known enemies, and he responded that he did not. (ECF No. 83-1 at 23.) When he was arrested for trafficking in April of 2012 he was booked into Elko County Jail and again was asked if he had any known enemies, and he responded that he did not. (*Id*. at 23-24.) He was arrested in the summer of 2012 for unauthorized possession of a stolen motor vehicle in Elko, and was asked if he had any known enemies. *(Id.* at 25.) He did not recall how he responded to that question. (*Id*. at 25-26.) Then when he was arrested on February 14, 2013 for failure to appear in Elko, he was asked if he had any known enemies. (*Id*. at 28.) It appears that he identified Jose Mendoza, Brett Badger and Munoz ("Chaparro").[3] (*Id*. at 28-29.) On that occasion, he was released almost immediately and never put into a cell. (*Id*. at 29.) Cortez-Munoz and Mendoza were in the house that Plaintiff had given information on (the Panorama Drive house), and Badger was associated with them. (*Id*.) He was arrested again on February 23, 2013 for possession and possession of stolen property in California, and was booked into jail in Placer County Jail in Auburn. (*Id*. at 30.) He was asked there whether he had any known enemies on intake, and he responded that he had none in California. (*Id*.)

Keema had no involvement in Plaintiff's housing in the Elko County Jail.

---

[3] According to Plaintiff, he refers to Munoz at different times as both Chapparo and Cortez-Munoz. (ECF No. 93 at 3 n. 1.)

**A. § 1983 Claim for Relief**

   **1. Allegations**

In analyzing this claim, it is helpful to reiterate Plaintiff's allegations relative to this claim. He contends that Keema violated his right to be free from serious risk of harm from other inmates and that Defendants acted with subjective knowledge that Paige posed a serious risk of harm to Plaintiff and disregarded that risk. (ECF No. 62 at 5 ¶¶ 29-30.) He also alleges that this was a custom of Elko County, evidenced by multiple exposures of Plaintiff and others to similarly harmful situations in housing inmates. (*Id.* ¶ 31.) As a result, he claims he was exposed to Paige in the cellblock. (*Id.* ¶ 32.)

Plaintiff's opposition includes arguments concerning Keema's alleged disclosure of Plaintiff's identity as the confidential informant, but this is not the basis of his § 1983 claim, as plead in the amended complaint. Therefore, the court will not consider those arguments.

   **2. Legal Standard**

Despite the Ninth Circuit announcing a shift in the law with respect to the standard applied to failure to protect claims of pretrial detainees prior to the filing of this dispositive motion, neither party cites the relevant authority, and consequently, the correct standard. *See Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (en banc), *cert. denied* 137 S.Ct. 831 (Jan. 23, 2017).[4]

A *convicted prisoner* who suffers injuries while in custody may sue prison officials under the Eighth Amendment's Cruel and Unusual Punishment Clause. *See Castro* 833 F.3d at 1067-68. A *pretrial detainee*, who has not yet been convicted, may do so under the Fourteenth Amendment's Due Process Clause. *Id.* at 1068 (citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979) (holding that, under the Due Process Clause, a detainee may not be punished prior to conviction)). There is no question that "prison officials have a duty to protect prisoners from

---

[4] Defendants cite to the original decision of the Ninth Circuit in *Castro*, 785 F.3d 336 (9th Cir. May 1, 2015) (*see* ECF No. 83 at 9:10-11), but that opinion was withdrawn and superseded, and rehearing en banc was subsequently granted, resulting in the operative opinion, 833 F.3d 1060 (9th Cir. Aug. 15, 2016), for which certiorari was ultimately denied, 137 S.Ct. 831 (Jan. 23, 2017).

violence at the hands of other prisoners[.]" *Farmer v. Brennan,* 511 U.S. 825, 833 (1994). Under both the Eighth and Fourteenth Amendments, "the plaintiff must show that the prison officials acted with 'deliberate indifference.'" *Id*. Under the Eighth Amendment, to establish deliberate indifference, a *convicted prisoner* must show objectively, that he was exposed to a sufficiently serious risk to his safety, and subjectively, that the prison official knew of and disregarded that risk. *Farmer*, 511 U.S. at 833. The Ninth Circuit recently clarified, however, that in light of the Supreme Court's ruling in *Kingsley v. Hendrickson*, 135 S.Ct. 2466 (2015) (holding that an objective standard is applied to an excessive force claim asserted by a pretrial detainee), the elements of a *pretrial detainee's* failure to protect claim under the Fourteenth Amendment are as follows:

> (1) The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;
> (2) Those conditions put the plaintiff at substantial risk of suffering serious harm;
> (3) The defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and
> (4) By not taking such measures, the defendant caused the plaintiff's injuries.

*Castro*, 833 F.3d at 1071.

Insofar as the first element is concerned, where, as here, the "claim relates to housing two individuals together, the inquiry at this step would be whether the placement decision was intentional." *Castro*, 833 F.3d at 1070. The court noted that this would not be satisfied "if the officer's inaction resulted from something totally unintentional." *Id*.

"With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily 'turn[ ] on the facts and circumstances of each particular case.'" *Id*. (quoting *Kingsley*, 135 S.Ct. at 2473 and citing Restatement (Second) Torts § 500 cmt. a (Am. Law. Inst. 2016)). The pretrial detainee must "prove more than negligence but less than subjective intent—something akin to reckless disregard." *Id*.

### 3. Keema

Keema argues that there is no evidence he had anything to do with the housing assignment in the jail or the policies of the Elko County Jail. (ECF No. 83 at 9-10.)

Plaintiff argues that he gave sensitive information to Keema based on assurances that his identity would not be disclosed, but Keema then named Plaintiff as the informant in the search warrant application, which Plaintiff claims that Keema knew, pursuant to statute, had to be left at the residence when the warrant was executed. (ECF No. 93 at 4.) Plaintiff contends that a genuine dispute of material fact exists as to whether the disclosure of Plaintiff's identity in the search warrant materials left at the Villano residence motivated Cortez and Paige. (*Id.*) He argues that the record has evidence that Corgan's "ratting" motivated these two criminals against him.

As indicated above, Plaintiff's failure to protect claim is predicated on his placement in the cell with Paige. The claim concerning the prior assault in the jail involving Cortez was dismissed with prejudice as barred by the statute of limitations, and Plaintiff does not allege that the subsequent shooting by Paige is the subject of the § 1983 claim. It is undisputed that Keema had no involvement in Plaintiff's placement in the cell with Paige. Therefore, summary judgment should be granted in Keema's favor with respect to this claim.

**4. Elko County**

In the § 1983 claim, Plaintiff alleges that he was exposed to Paige in the cellblock as a result of Keema's knowledge and disregard that Paige posed a serious risk of harm to Plaintiff. (ECF No. 62 at 5.) He further avers that this conduct was a custom of Elko County, "as evidenced by the multiple exposures of Plaintiff and others to similar harmful situations in housing inmates." (*Id.*)

Insofar as an entity defendant is concerned, such as Elko County, "a municipality may not be held liable for a § 1983 violation under a theory of respondeat superior for the actions of its subordinates." *Castro*, 833 F.3d at 1073 (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)). Instead, "a plaintiff must show that a 'policy or custom' led to plaintiff's injury." *Id.* (citing *Monell*, 436 U.S. at 694). The "plaintiff must demonstrate that the policy or custom of a municipality [must be shown to] 'reflect[ ] deliberate indifference to the constitutional rights of its inhabitants.'" *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 392 (1989)).

"The 'first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.'" *Id*. at 1075 (quoting *City of Canton*, 489 U.S. at 385). "The custom or policy must be a 'deliberate choice to follow a course of action … made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.'" *Id*. (quoting *Pembaur v. City of Cincinatti*, 475 U.S. 469, 483 (1986) (plurality)).

The plaintiff "must also demonstrate that the custom or policy was adhered to with 'deliberate indifference to the constitutional rights of [the jail's] inhabitants.'" *Id*. at 1076 (quoting *City of Canton*, 489 U.S. at 392). The Ninth Circuit has determined that the deliberate indifference standard for municipalities is objective. *Id*. In that regard, "'[w]here a § 1983 plaintiff can establish that the facts available to city policymakers put them on actual *or constructive notice* that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens, the dictates of *Monell* are satisfied.'" *Id*. (citing *City of Canton*, 489 U.S. at 396).

Elko County argues that Plaintiff was never harmed or threatened by Paige in the jail cell, and Plaintiff never testified that he feared Paige. (ECF No. 83 at 10.) In addition, Elko County maintains that every time Plaintiff was booked, it inquired whether Plaintiff had known enemies and he never identified Paige. (*Id*.) In sum, Elko County contends that there is no evidence that Elko County had a policy or practice that was deliberately indifferent to Plaintiff's rights.

Plaintiff argues that when you consider that Sergeant Adkins placed him in the same cell block as Cortez-Munoz within days of the search warrant identifying Plaintiff, and then placed Plaintiff in the same cell block as Paige, it allows for a reasonable inference of a custom or practice on the part of Elko County sufficient to sustain a claim of municipal liability. (ECF No. 93 at 6.)

The court must first consider whether there is "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Castro*, 833 F.3d at 1070 (citing

*City of Canton*, 489 U.S. at 385). To that end, "[t]he custom or policy must be a 'deliberate choice to follow a course of action … made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.'" *Id*. (quoting *Pembaur v. City of Cincinatti*, 475 U.S. 469 (1986) (plurality)).

"Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Ratification of decisions of a subordinate by an official with final decision-making authority can also be a policy for purposes of municipal liability. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). Mere acquiescence in a single instance of alleged unconstitutional conduct is not sufficient to demonstrate ratification of a subordinate's acts. *See Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992).

Even if there was no explicit policy, a plaintiff may establish municipal liability upon a showing that there is a permanent and well-settled practice by the municipality which gave rise to the alleged constitutional violation. *See Praprotnik*, 485 U.S. at 127. Again, allegations of random acts or single instances of misconduct are insufficient to establish municipal custom. *See Navarro v. Block*, 72 F.3d 712, 714-15 (9th Cir. 1996).

There is no evidence Elko County had an explicit policy of housing inmates together who have a history would pose a risk to one inmate. In fact, the record demonstrates that whenever Plaintiff was jailed he was asked on intake whether he had any known enemies. Therefore, to prevail on this claim, Plaintiff must establish that there was a well-settled custom or practice that gave rise to the alleged constitutional violation.

To satisfy this condition of municipal liability, Plaintiff points to two instances where he contends that Adkins transferred him to a cell with a known enemy: when he was placed in the cell with Cortez-Munoz and Cortez-Munoz subsequently beat him up, and when he was placed in the cell with Paige. (ECF No. 93 at 5-6.)

"A single constitutional deprivation ordinarily is insufficient to establish a longstanding practice or custom." *Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999). "A plaintiff cannot

prove the existence of a *municipal* policy or custom based solely on the occurrence of a single incident or unconstitutional action by a non-policymaking employee." *Davis v. City of Ellensburg*, 869 F.2d 1230, 1233 (9th Cir. 1989). Stated another way, "[l]iability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). There is not a clear delineation between "isolated or sporadic incidents" and "persistent and widespread conduct." *See e.g. Davis v. City of Ellensburg*, 869 F.2d 1230, 1233-34 (9th Cir. 1989) (single incident of excessive force inadequate to establish liability); *Meehan v. County of Los Angeles*, 856 F.2d 102, 107 (9th Cir. 1988) (two incidents insufficient); *Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005) (triable issue existed as to whether Seattle had unconstitutional custom of suppressing certain political speech based on testimony of several individuals that their entry to a particular area was permitted by police only after they removed offending buttons and stickers).

In this case, however, Plaintiff points to just two instances where he claims that Sergeant Adkins placed him in a cell with an enemy and argues that constitutes a practice or custom of Elko County. Even assuming that Adkins knew Cortez-Munoz and Paige were Plaintiff's enemies, the court finds that these two instances do not show a "longstanding practice or custom which constitutes the standard operating procedure of the local government entity." *See Trevino*, 99 F.3d at 918 (quotation marks and citation omitted). These two incidents to not rise to the level of a practice of "sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Id*. (citations omitted).

Plaintiff's reliance on *City of Oklahoma v. Tuttle*, 471 U.S. 808 (1985) is misplaced. (ECF No. 93 at 6.) There, a plurality of the Supreme Court said that "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be *attributed to a municipal policymaker*." *Id*. at 823-24 (emphasis added). One year later, in *Pembaur v. City of Cincinatti*, 475 U.S. 469 (1986), the Supreme Court said

that under certain circumstances, municipal liability may be imposed for a single decision or action by a municipal policymaker, but the court made clear that municipal liability only attaches when the decision maker possesses "final authority" to establish municipal policy with respect to the action. Id. at 481. In *Collins v. City of San Diego*, 841 F.2d 337 (9th Cir. 1988), the Ninth Circuit considered whether a police sergeant could be considered a policymaker with final authority for purposes of municipal liability. While the sergeant was a supervisor, in that he would oversee actions of the other officers, the court determined he was not an official "responsible for establishing final policy with respect to the subject matter in question." *Id*. at 341 (quotation marks and citation omitted).

There is no evidence that Adkins, a sergeant working in the jail, was an official policymaker with final decision-making authority for Elko County (or the Elko County Sheriff's Department), or that any official policymaker "either delegated that authority to, or ratified the decision of, a subordinate." *See Ulrich v. City and County of San Francisco*, 308 F.3d 968, 985 (9th Cir. 2002); *see also Monell*, 436 U.S. at 694; *Praprotnik*, 485 U.S. at 126-27.[5]

Accordingly, it is recommended that summary judgment be granted as to Elko County with respect to Plaintiff's § 1983 claim for relief.

**B. State Law Claims**

As indicated above, the amended complaint also includes state law claims for negligence, breach of contract and IIED.

> [I]n any civil action of which the district courts shall have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a).

///

---

[5] In the original complaint, Plaintiff had alleged that Elko County acted through its policymaking officials including commissioners, the sheriff, the undersheriff, and assistant sheriff. (*See* ECF No. 1 at 11 ¶ 4.) There are no allegations concerning who the policymakers were in the amended complaint, and Plaintiff has provided no evidence that Adkins, as a sergeant working in the detention facility, was a policymaker or was delegated such authority, or that any other policymaker with final decision making authority for purposes of municipal liability.

Even where the state law claims are related such that they form part of the same case or controversy, as they do here, the district court still retains discretion to decline to exercise supplemental jurisdiction. *See* 28 U.S.C. § 1367(c). The statute enumerates four circumstances where the district court may do so:

> (1) the claim raises a novel or complex issue of State law;
> (2) the claim substantially predominates over the claim or claims which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). The discretion to decline the exercise of supplemental jurisdiction when all other claims over which the court has original jurisdiction are dismissed is in line with the Supreme Court's statement that "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *United Mine Workers of Amer. v. Gibbs*, 383 U.S. at 726.

"That state law claims '*should*' be dismissed if federal claims are dismissed before trial, as *Gibbs* instructs …, has never meant that they *must* be dismissed." *Acri v. Varian Associates, Inc.*, 114 F.3d 999, 1000 (9th Cir. 1997) (en banc) (citations omitted) (emphasis original). "While discretion to decline to exercise supplemental jurisdiction over state law claims is triggered by the presence of one of the conditions in § 1367(c), it is informed by the *Gibbs* values "of economy, convenience, fairness, and comity." *Id*. (citation omitted).

In this case, it appears disputed facts likely exist with respect to certain aspects of the state law negligence, breach of contract and IIED claims. Given the somewhat novel factual circumstances presented by this case, it is recommended that the court refrain from deciding any attendant factual issues and whether Keema or Elk County's conduct violated Nevada law. Therefore, the state law claims should be dismissed without prejudice.

///

///

## IV. RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the District Judge enter an order **GRANTING** Defendants' motion with respect to the sole § 1983 claim; **DECLINING** to exercise supplemental jurisdiction over the remaining state law claims, and **DISMISSING** the remaining state law claims without prejudice.

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of receipt. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

DATED: June 20, 2017.

_____
WILLIAM G. COBB
UNITED STATES MAGISTRATE JUDGE